DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

08-847


JEROME WHIDDON, ET AL.

VERSUS

KIPPY BACQUE, ET AL.


**********
APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 215,207
HONORABLE F. RAE DONALDSON SWENT, DISTRICT JUDGE
**********

CHRIS J. ROY, SR.[1]
JUDGE

**********

Court composed of Michael G. Sullivan, Elizabeth A. Pickett, and Chris J. Roy, Sr., Judges.

AFFIRMED IN PART, AMENDED IN PART, AND RENDERED.

Jimmy Roy Faircloth, Jr.
4450 Stillmeadow Lane
Pineville, LA 71360
(318) 442-6236
Counsel for Plaintiffs/Appellants:
    Jerome Whiddon
    Loretta Whiddon


Aaron L. Green
Vilar & Elliott

---

[1]Judge Chris J. Roy, Sr. appointed judge pro tempore of the Court of Appeal, Third Circuit.

**P. O. Box 12730**
**Alexandria, LA 71315-2730**
**(318) 442-9533**
**Counsel for Plaintiffs/Appellants:**
    **Jerome Whiddon**
    **Loretta Whiddon**

**James Steven Gates**
**Morrow, Gates & Morrow**
**P. O. Drawer 219**
**Opelousas, LA 70571-0219**
**(337) 942-6529**
**Counsel for Defendants/Appellees:**
    **Kippy Bacque**
    **Nicole McIntyre**

**ROY, Judge pro tempore.**

This dispute arose out of a failed partnership between Jerome and Loretta Whiddon (the Whiddons) on the one hand and Kippy Bacque and Nicole McIntyre (Kippy and Nicole) on the other. The Whiddons sued Kippy and Nicole for their perceived portion of sales of turtles belonging to the partnership and for their living expenses during the term of the partnership. Kippy and Nicole's reconventional demand sought to recover the Whiddons' perceived portion of expenses associated with the partnership. The trial court assessed the income and expenses of the partnership and awarded damages of $3,849.00 to Kippy and Nicole. For the reasons set forth below, we amend the amount of the judgment and affirm.

### FACTS

The trial court's Reasons for Judgment included an excellent recitation of the facts pertinent to this matter. We rely greatly on that narration to set the stage for discussion of the issues on appeal.

The Whiddons' home was located on 2.2 acres of land in Rapides Parish. Jerome Whiddon lost his job in 2001, and he and his wife decided to try to make a living on that property as Red Oaks Turtle Farm ("Red Oaks"). Jerome had experience in trapping wild turtles and selling them to local turtle farmers. Loretta Whiddon's family members had some experience in turtle farming, but the Whiddons themselves had never been in the business or ever had a state required license to operate a turtle farm.

The Whiddons began construction of two ponds and a pad for a hatchery building and put water and 3,000 wild turtles in one pond before they concluded they had insufficient funds to complete construction and start the business. In mid-2002, Jerome secured more traditional employment in Lake Charles. The Whiddons listed

their property for sale, reserving the right to trap and remove the turtles once their hibernation period ended, after the sale.

Kippy Bacque was a professional musician who wanted to move to central Louisiana to stage music concerts at the Marksville casino. Nicole McIntyre had a background in gerontology. Long-time companions, Kippy and Nicole were shopping for a home when they came across the Whiddon place. Intrigued by the notion of turtle farming, they decided to purchase the property. After a meeting in November 2002, Kippy, Nicole, and the Whiddons decided in February 2003 to form a partnership to complete and operate the turtle farm. Kippy paid the Whiddons $112,500.00[2] and became the sole owner of the property, the unfinished building and the ponds. Kippy also paid the Whiddons $12,000.00 for 1,500 of the 3,000 turtles ($8.00 per turtle) that Jerome had put in the pond in 2002 and were on-site at the time of the purchase. According to Kippy, the partners were to contribute equally to the expenses and the work. When he realized the Whiddons had no money, however, he was forced to accept that the Whiddons' share of expenses would have to be deducted from future anticipated profit.

According to the Whiddons, they were to contribute their expertise about turtle farming and "some work" to the partnership, Kippy was to contribute the remainder of the financing for the venture, and Nicole was to contribute labor. The Whiddons considered the arrangement a 50/50 partnership, based on the two couples. Kippy and Nicole, however, were not married; they wanted the interest to be 25% each, according to the number of individuals. Testimony at trial did not reveal any final agreement on this issue.

Jerome agreed that he and Loretta were responsible for 50% of the operating

---

[2]Appellate briefs refer to the purchase price as $118,000.00, but the record shows it as $112,500. The purchase price is not material to the issues on appeal.

expenses, but he had no money to contribute to expenses as they accrued. He expected the Whiddons' share of the costs to be deducted from anticipated sales; at the time, the parties expected the farm to be a lucrative business. Everyone agreed that the two women, Loretta and Nicole, neither of whom had other employment, were to contribute the majority of the labor. Although the parties went to a lawyer to draw up a formal agreement, they never signed any papers. Jerome moved to Lake Charles to begin his new job, and the Whiddons rented an apartment in the Alexandria/Pineville area where Loretta and the children could live while they worked at the turtle farm.

By mid-summer 2003, Kippy and Nicole concluded the Whiddons had no expertise in turtle farming and that neither Jerome nor Loretta was providing his/her fair share of labor. Kippy showed he spent $50,525.00 to complete the pond and hatchery, $18,632.71 for more turtle stock, and $12,819.58 in other operational costs. Jerome showed he spent $2,544.37 to trap more wild turtles that were added to the stock at the farm.

Despite the conflicts between the two sides of the partnership concerning expenses and labor, turtle eggs were harvested through July 2003, and the crop produced hatchlings planned for export to China. However, while Kippy and Nicole were out of town in August 2003, a breaker overload caused a power outage in the hatchery. All of the hatchlings died from the heat. Income in 2003 totaled only $3,481.28 from the sale of approximately 3,000 adult male turtles to Eddie Jolly, a fellow turtle farmer who testified as an expert at trial.

In October 2003, Kippy and Jerome had a conversation in which the partnership was ended. Kippy described the partnership termination as a unilateral decision on his part, based on the Whiddons' inability to pay expenses and failure to

3

come to work. Kippy sent a letter dated October 15, 2003 to the Whiddons asking them to remove all of their personal property from the 2.2 acre farm. The Whiddons then sent Kippy a demand letter for half the money received from the sale of the turtles to Jolly.

Kirby King and Jolly testified as experts at trial, with little difference in their testimony. Both agreed the goal of the turtle farm was to produce hatchlings smaller than four inches to export to China.[3] Both also agreed the market for turtles in 2003 was strong. Much to their dismay, without warning, China began to raise its own turtles in 2004, causing the collapse of the U.S. market. Indeed, King had sold his entire 2003 harvest by October, but at the time of trial in March and June, 2007, King had 400,000 turtles he had not sold.

King testified he had been a turtle farmer for more than twenty years. He knew Loretta's father, but not as a turtle farmer. King testified wild turtles took two to three years to acclimate to living in a pond. In 2003, King paid $3.00 each for wild turtles, but he would not have been willing to sell his pond-acclimated brood stock for $8.00 each, the price Kippy paid Jerome for half the original stock. King would not expect Red Oaks, beginning business in 2002, to turn a profit until 2005, when the farm would need ten to fifteen thousand turtles to produce eggs.

King also testified about the pond the Whiddons had built with steep, rather than sloping, sides. According to King, the slope would not affect how many eggs the turtles would lay, but steeps sides were more expensive to maintain because the turtles would tear up steeper sides while climbing into the egg-laying area. King also believed the Whiddons' pond was too deep—17 feet at one end. At the time of trial, King had two three- to four-feet deep ponds; in 1992, he had built an eight-feet deep

---

[3]This size turtle cannot be sold in the United States because of the risk of salmonella.

pond. His testimony explained how the eight-feet pond required too much time to warm, and he would not construct such a deep pond again. The deeper pond was slower to end the turtles' hibernation period. King had not seen the Red Oaks pond.

Jolly had been turtle farming since 1988. Very active in marketing the turtle industry, Jolly was president of the Independent Turtle Farmers and co-owner of a private turtle-marketing company. Jolly knew "both sides" of the lawsuit. He knew Loretta's father as a fisherman, not as a turtle farmer. He had bought adult male turtles from Jerome and his brother for about a year. Jolly came to know Kippy and Nicole after they began operating the farm.

Jerome and Jolly spoke when the Whiddons began their pond construction, and Jolly saw the pond multiple times during construction. Jolly inspected the area for Jerome, and they discussed what to do to hold the turtles in the pond. Jolly believed Jerome's problem was the natural drain of the land. According to Jolly, the land was against Jerome, causing him to dam the lower end and build a retainer wall. Jolly had never seen this type of drain used for a pond, and he thought Jerome would need an extra powerful wall to keep the turtles contained. Because the low end of the pond was 17 feet deep, Jolly told Jerome the pond would be more expensive to maintain, and he would have difficulty keeping the turtles warm.

Jolly and Jerome also discussed the partnership, and Jolly advised him not to take a partner. However, Jolly agreed that $8.00 per turtle, the price Kippy paid Jerome for half the original stock, was a great price. Jolly did not expect the Whiddons to make a profit in 2003 because the turtles were not yet pond acclimated and, therefore, would not produce enough eggs.

Other witnesses included Gerald Norris, who did construction work on the hatchery and pond for first, the Whiddons, and then, Kippy. Norris testified he also

repaired the roof of the house after the sale to Kippy, at Kippy's sole expense. He testified Jerome, speaking of work on the hatchery, asked him to "go easy on us because I [Jerome] have to pay one-half and he [Kippy] has to pay one-half."

The trial court found the partnership terminated around October 15, 2003, and it divided the operating expenses between the Whiddons and Kippy and Nicole as of that date. Undisputed testimony showed Kippy had sold 3,000 turtles to Jolly around September of 2003, leaving 7,000 turtles in the pond at the time the partnership ended. The trial court, however, erroneously deducted the 3,000 turtles that were sold from the 7,000 present when the partnership ended. The trial court valued those 4,000 turtles, credited the Whiddons with half that determined value, and rendered judgment in favor of Kippy and Nicole in the amount of $3,849.00.[4] The Whiddons appeal this judgment, arguing the trial court applied incorrect factual and legal analyses.

## ASSIGNMENT OF ERRORS

The Whiddons allege five assignments of error:

1. The trial court erred as a matter of law when it concluded that Red Oaks Turtle Farm dissolved on October 15, 2003.

2. The trial court erred as a matter of law when it incorrectly based its analysis on Louisiana Civil Code Article 2833, instead of Article 2823.

3. The trial court erred as a matter of law when it relied on *Smith v. Scott*, 26,849 (La.App. 2 Cir. 5/10/95), 655 So.2d 582, *writ denied*, 95-1450 (La. 9/22/95), 660 So.2d 475.

4. The trial court erred as a matter of law when it failed to apply Louisiana Civil Code Article 2824 and order the defendants to pay interest on the value of the Whiddons' share from the time their membership ceased.

5. The trial court committed reversible error when it improperly valued the turtle stock.

---

[4]This amount results from a mathematical error. The correct amount of half the expenses less half the value of 4,000 turtles is $4,245.95.

6

After review of the record, we agree with the trial court's assessment that "the only thing the parties here proved was that neither of them should have gone into the turtle business, much less with each other." While the trial court's ultimate judgment included a mathematical error and a factual error, its reasoning is correct.

Applying the court's reasoning, the judgment amount should be based on 7,000 turtles. We agree with the trial court's reasoning that the Whiddons are responsible for one-half the operating expenses until the time the partnership ended, less a credit for one-half the value of the stock on hand at that time. However, we correct the trial court's mathematical error, finding the Whiddons' share of unpaid operating expenses totals $8,795.73. Further, we find that the stock on hand at the time the partnership ended was 7,000 turtles. Applying the trial court's method of evaluation, we credit the amount owed by $6,496.00, one-half the calculated value of the 7,000 turtles. We amend the judgment in favor of Kippy and Nicole to $2,299.73.

I.    Dissolution of the partnership

The Whiddons first allege the trial court erred by finding the partnership dissolved on October 15, 2003 because Kippy and Nicole continued to operate the turtle farm. We believe the existence of the partnership entity and the operation of the farm do not necessarily relate to each other. As the trial court found, all parties agreed the partnership had ended by October 15, 2003. The trial court further found as a matter of fact that the evidence did not support the Whiddons' contention that they were expelled from the partnership against their will.

The parties exchanged correspondence dealing with the storage of the Whiddons' personal property at the farm and the Whiddons' request for payment of half the money generated by the sale of turtles in 2003. Transcripts of recorded

telephone conversations show the parties discussed the termination of the partnership. Kippy and Jerome had a meeting where they discussed the end of their relationship. During each of these events, the Whiddons neither protested the termination of the partnership nor sought to continue it. Thus, the finding that the partnership ended on or around October 15, 2003 is a reasonable one supported by the record. The trial court was not clearly wrong in making this factual finding.

II.     Application of Civil Code Articles

The Whiddons complain that the trial court erroneously relied on La. Civ.Code art. 2833 to allocate partnership assets and expenses. Although the trial court cited Article 2833 in its Reasons for Judgment, in reality, the trial court's method of allocation follows Article 2823, as the Whiddons claim it should.

Article 2823 allows "[t]he former partner . . . an amount equal to the value that the share of the former partner had at the time membership ceased." This is exactly the result of the trial court. The trial court considered the total amount of expenses of each side, found the Whiddons owed a portion of those expenses, and credited them the amount owed with half the value of partnership assets—turtle stock—on hand at the time the Whiddons' membership in the partnership ceased.

The parties expected to put their agreement in writing, but they never did. Kippy claims the Whiddons were to be responsible for half the "expenses," without specifying the nature of those expenses. If the parties thought about it at all, it does not appear the Whiddons agreed to pay for any improvements to the land they sold to Kippy. With Kippy being the sole owner of the property and with no writing to make the partnership responsible in some way for the use of Kippy's property or to make the partnership the owner of the improvements, Kippy could not reasonably expect the Whiddons to pay for improvements to real property they had sold to him.

8

We find that the Whiddons correctly assumed they would not have to bear any portion of the expenses necessary to complete the improvements to Kippy and Nicole's property.

On the other hand, it is unreasonable for the Whiddons to believe Kippy would bear all the expenses of the farm's operation and then share all the profit with them, without consideration of the expenses. Indeed, Jerome testified he knew he would be responsible for half the operational expenses; he just had to pay his share from the profit. That is exactly how Kippy decided to remedy the lopsided burden of paying the expenses. Had profit, not loss, resulted, the plan may have worked.

Evidence showed each side in this partnership began with a stock of 1,500 turtles, for a total of 3,000 turtles in the pond at inception of the enterprise. The Whiddons expended $2,544.37 in the farm's operation from February to October 15, 2003, and Kippy and Nicole spent $23,617.11, excluding the cost of a boat and construction expenses. Thus, operating expenses totaled $26,161.48; the Whiddons and Kippy and Nicole were each responsible for $13,080.74.[5] Kippy paid more than his half in advance. Allowing the Whiddons credit for the amount they already expended, they still owe an additional $10,536.37. The Whiddons should be given further credit for their half of the turtle sale to Jolly, which reduces their debt by $1,740.64 to $8,795.73, and another credit for half the value of the stock at the end of the partnership, as discussed in Section V below.

This method of allocating half the expenses and half the sales to each side of the partnership is exactly in line with Article 2823. While the trial court may have cited Article 2833, the court followed the path of Article 2823, arriving at an amount equal to the value of the Whiddons' shares at the time the partnership ended. The

---

[5]Another mathematical error resulted when the trial court mistakenly totaled Kippy's operating costs as $21,877.56 and total operating costs as $24,421.93.

9

Whiddons' alleged assignment of error, that the trial court did not follow Article 2823, is without merit.

III.     Reliance on *Smith v. Scott*

The Whiddons incorrectly argue that the trial court misapplied the reasoning of *Smith v. Scott*, 26,849 (La.App. 2 Cir. 5/10/95), 655 So.2d 582, *writ denied*, 95-1450 (La. 9/22/95), 660 So.2d 475.  Again, the Whiddons argue they are entitled to the value of their share of the partnership at the time it ended.  As explained above, this is exactly what the trial court did; it considered operational expenses, partnership income, and partnership asset inventory to derive a value at the time the partnership ended.

Both *Smith* and Article 2823 contemplate the determination of the value of a partnership share by considering expenses or debts along with assets or income.  The trial court did this by considering both parties' expenses and offsetting those expenses by the income generated by the sale of the turtles and the value of the turtle stock.  This assignment of error likewise has no merit.

IV.     Interest on the value of the Whiddons' partnership share

The Whiddons argue they are entitled to legal interest on the amount of their share  from the time the partnership ended.  The value of their share, however, is a negative number.  Because nothing is owed to the Whiddons, they are entitled to no interest.  Accordingly, this assignment of error is moot.

V.     Valuation of the turtle stock

The Whiddons contend the trial court erred in calculating the number of turtles owned by the partnership at the time it terminated and in calculating the dollar value of each turtle.  While we agree with the trial court's method of determining the value of the turtles, we find a factual error in the number of turtles used in that evaluation.

10

The trial court found 4,000 turtles remained in the pond on the date of the partnership's termination. Undisputed testimony, however, showed the Whiddons and Kippy and Nicole had amassed a farm of approximately 10,000 turtles around August or September of 2003. Kippy sold approximately 3,000 of those turtles to Eddie Jolly around September of 2003. No one disputed Kippy's trial testimony that the farm had 7,000 turtles at the time the partnership ended.

The trial court, however, erroneously considered the 3,000 turtles sold to Jolly to reduce the stock of 7,000, when testimony showed 7,000 turtles remained after the sale. Therefore, we must determine the value of the stock on hand based on an inventory of 7,000 turtles.

The parties submitted evidence that adult female turtles had a higher value than adult male turtles, but they failed to show the court how many females and males were in the stock of 7,000. Thus, the only evidence of the breakdown of turtle gender is found in a trial exhibit showing the number of female, male, and missing turtles in a 2005 inventory. The trial court determined the percentages of each category from that exhibit and applied the same percentages to the October 2003 inventory of 7,000 turtles. In absence of any other evidence to begin to determine a value of the turtle stock in October 2003, we agree with the trial court's assignment of percentages based on the only evidence at hand.

The exhibit showed that, in 2005, 52.47% of the turtles were female, 28.18% were male, and 19.35% were missing. Applying those percentages to the 2003 stock of 7,000 turtles (as the trial court did using an inventory of 4,000 turtles), we find 3,673 of the turtles were female, 1,973 were male, and 1,354 were missing.

The Whiddons contend these female and male turtles should be valued at $8.00 each, according to the price Kippy paid them for his half of the original stock.

11

Testimony showed, however, that $8.00 may have been an appropriate price only for pond acclimated turtles; the value of wild turtles was much less, and the Red Oaks turtles were not yet pond acclimated. The trial court correctly relied on Jolly's testimony that he purchased adult male turtles from Kippy for no more than $1.00 each. Further, the trial court correctly relied on the expert testimony that adult female turtles, not pond acclimated, were worth about $3.00 each.

Applying the trial court's valuation of the individual turtles, we find the value of the stock at the time the partnership ended is $12,992.00—$11,019.00 for 3,673 females, plus $1,973.00 for 1,973 males. Half the value of the stock is $6,496.00. The Whiddons' share of the expenses must be reduced by half the value of the stock attributable to them. Thus, we reduce the $8,795.73 owed by the Whiddons by $6,496.00, for a total of $2,299.73 owed by the Whiddons.

## CONCLUSION

The trial court's methodology correctly considered the amount of the Whiddons' unpaid operating expenses, the sale of turtles during the partnership, and the number and value of the turtle stock on hand at the time the partnership ended. We affirm the trial court's judgment to that extent. However, we find the trial court erred mathematically in determining the amount of expenses and erred factually in determining the value of the stock by using an incorrect number of turtles. Therefore, we amend the judgment to reflect the correct amount of expenses and to value the stock based on 7,000 turtles. We award judgment in favor of Kippy Bacque and Nicole McIntyre in the amount of $2,299.73, with all costs to be paid by the Whiddons.

**AFFIRMED IN PART, AMENDED IN PART AND RENDERED.**

12